IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | |
|---|---|
| MARK W. BRYAN, | |
| Petitioner, | |
| vs. | No. 01-2564-Ma |
| WAYNE BRANDON, | |
| Respondent. | |

---

ORDER GRANTING RESPONDENT'S MOTION FOR A STAY PENDING APPEAL
AND
ORDER DENYING PETITIONER'S MOTION FOR RELEASE PENDING APPEAL

---

On March 31, 2005, the Court issued an order granting summary judgment to Petitioner on claim one and granting an unconditional writ of habeas corpus. (Docket Entry ("D.E.") 59.) Respondent filed a notice of appeal on May 2, 2005, and Petitioner filed a notice of cross-appeal on May 10, 2005. The case is currently on appeal, docketed as Sixth Circuit case no. 05-5705.

On April 29, 2005, Respondent filed a motion seeking a stay of the March 31, 2005 order pending resolution of the appeal. (D.E. 63.) On May 10, 2005, Petitioner, through counsel, filed a motion for release pending appeal. (D.E. 67.) The accompanying legal memorandum also constituted Petitioner's response to Respondent's motion. Respondent filed a response to Petitioner's

motion on May 24, 2005 (D.E. 72), and Petitioner filed a reply, without leave of Court, on May 31, 2005 (D.E. 73). The Court issued an order on June 2, 2005 scheduling an evidentiary hearing on the motions. That order also provided that "[t]he parties should also be prepared to address the amount of bond, if any, and other conditions of release that should be imposed." 06/02/05 Order (D.E. 74) at 3.

The Court conducted a detention hearing on July 15, 2005.[1] Respondent submitted proposed findings of fact and conclusions of law on August 1, 2005 (D.E. 89), and Petitioner submitted his proposed findings and conclusions on August 2, 2005 (D.E. 91). Each party filed a response to the proposed findings and conclusions submitted by the other on August 11, 2005. (D.E. 96, 97.) On August 4, 2005, Respondent submitted a tape recording of Bryan's first parole hearing, held on August 8, 2000. (D.E. 94.)[2] On August 15, 2005, Petitioner filed a motion to supplement the

---

[1]     On June 30, 2005, Petitioner filed a motion asking that the parties be directed to file disclosure statements, listing the witnesses and exhibits to be used at the hearing, by July 11, 2005. (D.E. 81.) Respondent did not object to that motion (see D.E. 82), which was granted on July 11, 2005 (D.E. 84). Respondent filed his disclosure statement on July 11, 2005 (D.E. 85), but Petitioner did not file a disclosure statement.

[2]     At the detention hearing, Bryan's counsel objected to introduction of the transcript of that hearing, which was not prepared by an independent court reporter. 07/15/05 Tr. (D.E. 99) at 5. Respondent sought leave of Court to file a copy of the tape recording of that hearing, id. at 12-14, and the Court reserved its ruling on admissibility of that tape recording until the relevance could be established, id. at 13-14. After reviewing the tape, and having received no objection from Petitioner, it is ADMITTED into evidence. At the hearing, Bryan testified about the murder and about his subsequent flight to Florida, and he was questioned at length on those matters by two members of the Board, who concluded, at the close of the hearing, that Bryan was not credible. These matters are of unquestionable relevance to the issues before the Court.

record of the detention hearing (D.E. 98), which the Court denied in a separate order issued on July 26, 2006 (D.E. 101).

Respondent's motion for a stay, and Petitioner's motion for release, are governed by Rule 23(c) of the Federal Rules of Appellate Procedure, which provides:

> **Release Pending Review of Decision Ordering Release.**
> While a decision ordering the release of a prisoner is under review, the prisoner must—unless the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or   judge or justice of either court orders otherwise—be released on personal recognizance, with or without surety.

"[A] court has broad discretion in conditioning a judgment granting habeas relief." Hilton v. Bruanskill, 481 U.S. 770, 775  (1987). "Rule 23(c) undoubtedly creates a presumption of release from custody in such cases, but that presumption may be overcome if the judge rendering the decision, or an appellate court or judge, 'otherwise orders.'" Id. at 774 (footnote omitted). The factors relevant to a stay application are:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Id. at 776. The presumption in favor of release "may be overcome if the traditional stay factors tip the balance against it." Id. In making that evaluation, the Court is authorized to consider whether the petitioner presents a flight risk, the danger to the public posed by the petitioner, and the State's interest in

continuing custody and rehabilitation of the petitioner. Id. at 777-79. "Continued custody is permissible when the State establishes a strong likelihood of success on appeal or a substantial case on the merits provided that the State will be irreparably injured absent a stay and the public interest militates against release." Williams v. Jones, No. 02-CV-73068, 2005 WL 3434806, at *1 (E.D. Mich. Dec. 14, 2005) (citing Hilton, 481 U.S. at 778).

As to the likelihood of success on the merits, there is little useful case law explaining how that standard is to be applied in the habeas context. That the Court granted an unconditional writ of habeas corpus necessarily means that the Court believes Petitioner is entitled to relief on claim one and, therefore, that the State has failed to demonstrate a likelihood of success on the merits of its appeal. As even Petitioner seems to concede, however, in Petitioner's Proposed Findings of Fact and Conclusions of Law, filed Aug. 2, 2005 (D.E. 91), at 9, the issues presented were complex and difficult and it is possible that the appellate court may come to a different conclusion on Petitioner's entitlement to relief on claim one. Nonetheless, the Court concludes that Petitioner has a "substantial case on the merits" of his appeal. Williams, 2005 WL 3434805, at *1.[3]

---

[3]     The Court declines to address in detail the arguments advanced by Respondent about his likelihood of success on the merits, as the Court has no jurisdiction to revisit those matters due to the pendency of the appeal. Tate
(continued...)

As to the second <u>Hilton</u> factor, the case law does not clearly articulate the standards for evaluating the State's claim of irreparable injury in the absence of a stay. Respondent has suggested, repeatedly, that, if Bryan were released pending appeal, it might abandon its appeal and proceed to retry him on the original indictments. Motion for Stay, filed Apr. 29, 2005, at 2 (D.E. 63), at 2; Respondent's Response in Opposition to Petitioner's Motion for Release Pending Appeal, filed May 24, 2005 (D.E. 72), at 2-3. Although Respondent's loss of his opportunity to appeal the Court's decision on claim one is entitled to some consideration, Respondent has not set forth sufficient facts to permit the Court to give any weight to this argument. For example, Respondent has not suggested, much less attempted to demonstrate, that the decision would materially prejudice it in litigating habeas petitions filed by other inmates.[4] The Court therefore gives

---

[3]     (...continued)
<u>v. Workman</u>, 958 F.2d 164, 167-68 (6th Cir. 2002).

        That Petitioner has demonstrated a substantial case on the merits with respect to his entitlement to habeas relief does not mean, however, that the Court has concluded he is ultimately likely to go free, even if the grant of habeas relief is affirmed on appeal. As discussed <u>infra</u>, Petitioner remains under indictment for first degree murder, a more serious charge than that encompassed by his original guilty plea.

[4]     The precedential effect of the Court's decision is not, of course, the only means by which the State could demonstrate irreparable injury. It is conceivable that the State seeks to pursue an appeal because of concerns that the passage of time may render it difficult to secure the evidence and witnesses necessary to retry Bryan. If that were the case, the State likely would have strategic reasons to downplay those concerns. The Court, however, cannot speculate as to the injury sustained by the State.

little weight to this aspect of the State's irreparable injury argument.

The State does, however, have an indisputable interest in preserving its ability to retry Bryan on the original indictments if the Court's grant of habeas relief is affirmed by the Sixth Circuit.[5] The grand jury returned two indictments against Bryan for first degree premeditated murder and felony murder. 02/17/04 Order (D.E. 48) at 3.[6] The State is not barred from proceeding against Bryan on the original charges in the indictments, which are still pending given the grant of habeas relief on the second degree murder conviction. R. 05/24/05 Br. (D.E. 72) at 3 n.2; see also State v. Williams, No. W2001-00452-CCA-R3-CD, 2002 WL 1482695, at *6-*7 (Tenn. Crim. App. Mar. 15, 2002).[7]

The Court finds that the State has made a sufficient showing of irreparable injury because of the risk that Bryan would flee to avoid facing the first degree murder indictments. Hilton, 481 U.S. at 777. After the victim was killed on March 29, 1985, his

---

[5]    The State also argues that it has an interest in the continued custody of Bryan. R. 05/24/05 Br. (D.E. 72) at 3. That factor appears to relate more closely to the public interest prong of Hilton than to irreparable injury, however, and it will be addressed infra.

[6]    As discussed at length in previous orders, Bryan was never indicted for second degree murder but, pursuant to a negotiated plea agreement, entered a guilty plea to that charge.

[7]    This is not a case in which Bryan is arguably factually innocent of any criminal charge arising out of the death of the victim, Timothy J. Ross, on March 29, 1985. The stipulated facts are more than sufficient to convict Bryan of second degree murder, see 02/17/04 Order (D.E. 48) at 4-5, and they also provide support for the charge of felony murder.

6

automobile was burned to cover up the crime and Bryan fled to Florida, where he was arrested. 02/17/04 Order (D.E. 48) at 5. Bryan's testimony at his parole hearing is largely consistent with the stipulated facts and adds the additional details that Bryan's accomplice, Shawn Patrick Nichols, moved the victim's body twenty-five (25) yards away from the road so it could not be seen by passersby and that Bryan did not return to his employment after the victim's death because "I was making plans to leave town."[8]

Also relevant to assessment of Bryan's flight risk is his participation in a scheme, during his incarceration, to forge judgment papers in an attempt to hasten his release date. Bryan gave the following sworn statement on December 16, 1993:

---

[8]    As Respondent has pointed out (D.E. 89 at 3), in his testimony at the detention hearing Bryan strongly suggested that his travel to Florida was unrelated to the murder of Ross. 07/15/05 Tr. (D.E. 99) at 66. Bryan testified as follows:

Q.         When did you go to Florida? Was it soon after the murder or sometime after?

THE COURT: Limit it to when did you go to Florida without implying the rest of it.

A.         Several weeks after I saw that a murder on TV had happened. I saw it on TV.

. . . .

Q.         Why did you go to Florida?

A.         My wife wanted to go see her daddy. . . .

Id. (Bryan's statement that "I saw it on TV" may also suggest that Bryan was unaware of the murder itself until he saw it reported on televison. At his parole hearing in 2000, Bryan testified that he knew that the victim was dead at the time Nichols moved the body.) This version of events is materially different from the stipulated facts underlying Bryan's guilty plea and his testimony at his parole hearing.

My name is Mark W. Bryan and I'm giving this statement to explain the forged documents that went to Wynema Helms to change my red date and safety valve.

I had an inmate friend, Joe Lattimer[,] who came to me telling about how he had beat an 8 yr sentence by forging his sheets and getting his 37 yr old girlfriend (name unknown) to drop off a letter to her friend Wynema Helms. I helped him prepare my forged papers and he took the papers with him on a trip to Nashville. They were supposed to be taken to Helms who works for the D.O.C.[9] and enters the dates and changes in the DOC computir [sic].

I guess he got the notary on his own and we used different wheels to get the look of a legal document on the typewriter.

I don't know Helms or why she does this but according to Lattimer she's done it several times before.

I don't know Fred Smith but I heard about him getting out on forged papers but not from Lattimer that I recall.

R. Ex. 17; see also 07/15/2005 Tr. (D.E. 99) at 44-45 (statement is consistent with what Bryan told the TBI agent).[10] Bryan took part in the scheme to reduce the amount of time he would have to serve until his release eligibility date, 07/15/2005 Tr. at 45-46, stating that "[a]n inmate that did legal work said he knew how to get my percentage reduced, and this turned out how to be how," id. at 46. The forgery was apparently detected, see id., although the record does not reveal who discovered the scheme. Not only does

---

[9]   Bryan is presumably referring to the Tennessee Department of Correction.

[10]   The exhibit numbers refer to documents admitted into evidence at the detention hearing on July 15, 2005.

this incident demonstrate dishonesty, it is uncomfortably similar to an escape attempt.

The risk to the community is also relevant in assessing the public interest. Bryan has had problems with drugs and alcohol for more than twenty (20) years. See, e.g., 07/15/2005 Tr. at 52. He testified at his parole hearing in 2000 that he killed the victim while under the influence of alcohol, cocaine, and Dilaudid. Bryan admitted to having drug paraphernalia in his cell in March, 1987. 07/15/2005 Tr. at 35-36; see also R. Ex. 18; R. Ex. 16 at 261-62. Bryan testified that he entered voluntary administrative segregation in December, 1987 in order to break his addiction to "needle dope, shooting dope, pills." Id. at 53. He testified that the treatment worked. Id. Nonetheless, in 1988, Bryan pleaded guilty to possessing homemade wine in his cell. Id. at 37-37.[11] Subsequently, Bryan obtained a certificate of completion for a ten-week alcohol and drug education program on August 20, 1990. P. Ex. 5. Bryan had a positive drug test in 1988 for marijuana. 07/15/2005 Tr. at 38-39. Bryan admits he was using marijuana at the time and "I got told on." Id. at 39. Bryan returned to substance abuse therapy in 2000, obtaining a certificate of completion on April 5, 2000. P. Ex. 5. Bryan had another positive drug screen for marijuana in 2004. 07/15/2005 at 39-40. Although he attempts to

---

[11]     Bryan testified at the detention hearing that "[t]his was my cell partner's line, but both of us have to plead guilty in a situation like that." Id. at 38. At the time, however, he stated that he recognized his problem and promised he would not have any more wine. Id.

9

attribute that test result to secondhand smoke from his cellmate, that explanation was apparently rejected by the disciplinary board. R. Ex. 18; see also R. Ex. 16 at 547 (change in classification level due to disciplinary conviction). There is no definitive way to assess whether, as Petitioner's counsel assert, the treatment worked and Bryan's abuse of drugs and alcohol has ended. It is plain, however, that Bryan has a proclivity to abuse drugs and alcohol.[12] These substances would be more readily available to Bryan on release.

The Court is also concerned about Bryan's ability to find suitable employment and housing. While in prison, Bryan completed courses in electrical wiring and obtained a certification from the Environmental Protection Agency to do air conditioning and refrigeration work. 07/15/05 Tr. at 19-20. Since 1990, Bryan's prison job has involved working on the air conditioning systems at the facilities to which he was assigned. Id. at 21. Bryan has been classified as a trusty since 1998. Id. at 23-24. Although Bryan's job skills appear to be readily transferable to a nonprison setting, the testimony concerning his job prospects was vague. Lou Bryan, Bryan's mother, testified that an individual at her church who works in heating and air conditioning would "take his application" once he was released, but "[h]e didn't want to commit himself until Mark was really free to work." Id. at 71-72. Mrs.

---

[12]    The Court is also concerned that, if Bryan were released, there would be no means of subjecting him to ongoing drug screens.

Bryan acknowledged that a person with her son's criminal record might have difficulty finding employment, id. at 73-74,[13] but stated that "[h]e can always advertise and work for himself, because heating and air-conditioning jobs are plentiful, at least at this time of the year," id. at 75.

Bryan's housing prospects are also uncertain, notwithstanding the support of his family. Mrs. Bryan, who was seventy-nine (79) years old at the time of the detention hearing, hoped that Bryan could live with her "until he gets his feet on the ground." Id. at 70; see also id. at 71. Mrs. Bryan lives in a subsidized housing development for the elderly, so Bryan, who is not elderly, could stay with her in her present home for only seventeen (17) days. Id. at 70-71, 73. Mrs. Bryan testified that, upon Bryan's release, their plan was "[t]o move to a two-bedroom apartment near where my brother lives, and Mark, of course, will have to go to work because our apartment rent is going to be much higher than a HUD-subsidized apartment, and we need to buy a truck and need some money." Id. at 71.[14] Two of Mrs. Bryan's three brothers live in the Memphis area and have promised to be "supportive," id. at 72; see also id. at 77-78 (testimony of Bud

---

[13]     Bryan also suffers from hepatitis B and C, and he has a ruptured disk in his back, id. at 35, although it is not clear whether these conditions would substantially impair his ability to work in the heating and air conditioning field.

[14]     As to the need for a truck, Mrs. Bryan explained that "I had to sell my car because the doctor doesn't let me drive anymore, so we will have to buy a truck for Mark and get us some way to get around." Id. at 73.

Russell); id. at 79-80 (testimony of Donald Russell of Paragould, Arkansas), although it is not clear that the support would be financial.[15]

Finally, the Court's view of the public interest is influenced by the absence of any effective means of supervising Bryan. Although Mrs. Bryan testified that she is able to post bond in the amount of $15,000, id. at 70, the Court is not persuaded that this will materially reduce the risk of flight.[16] There is no evidence that the Court has the ability to require drug testing or any other supervision of Bryan during the pendency of his appeal.[17]

The Court finds that the risk to the public in releasing Bryan pending appeal outweighs his liberty interest. The motion for a stay pending appeal is GRANTED. The motion for release is DENIED.

IT IS SO ORDERED this 14th day of December, 2006.

s/ SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

---

[15]    Although Bryan's mother and uncles would encourage him to stay away from alcohol and drugs, even his mother recognized, implicitly, that she has no authority over him. Id. at 74 ("I can call him in the morning to go to work on time and just ask him to come home, and I believe he will when the day is finished. I know he won't want to stay home every night and not go out and see the world some of the time.").

[16]    The Court is further concerned that, as Mrs. Bryan does not appear to be well off, use of her certificate of deposit for bond would substantially impair her ability to obtain an apartment and a truck if Bryan were released.

[17]    The order scheduling the detention hearing directed the parties to address "the amount of bond, if any, and other conditions of release that should be imposed." 06/02/05 Order (D.E. 74) at 3.